UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


| | | |
|---|---|---|
| MINC, LLC, | ) | CASE NO. 22-cv-1655 |
| | ) | |
| Plaintiff, | ) | JUDGE BRIDGET MEEHAN BRENNAN |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| ANDREW STEBBINS, *et al.*, | ) | **AND ORDER** |
| | ) | |
| Defendants. | ) | |


Before the Court is the Joint Motion to Stay and Motion to Certify a Question of Law to the Ohio Supreme Court submitted by Defendants Andrew Stebbins and Buckingham, Doolittle & Burroughs, LLC.  (Doc. 46.)  The motion is fully briefed.  (Docs. 48, 49.)  Also before the Court is Defendants' partial motion to dismiss the first amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. 44.)  Minc, LLC opposed that motion (Doc. 47), and Defendants replied (Doc. 50).  After consideration of all briefing, and for the reasons explained below, the Court DENIES the motion to stay and to certify a question of law to the Ohio Supreme Court, and GRANTS in part and DENIES in part the motion to dismiss.

I.       **Background**

    A.       **Factual Background[1]**

Minc, LLC ("Minc") is a law firm specializing in litigating online reputational harm. (Doc. 36, PageID #481.)[2]  Minc hired Andrew Stebbins ("Stebbins") as an associate in March 2019.  (*Id.* at 482.)  When Stebbins joined Minc, Minc required him to sign an employment agreement (the "Employment Agreement").  (*Id.*)  The Employment Agreement, in part, includes restrictions on Stebbins' use of confidential and trade secret information and includes a non-solicitation provision restricting his ability to solicit Minc's employees should he depart from Minc.  (*Id.*)  Specifically, the Employment Agreement provided, in relevant part:

    Confidentiality.

> At all times following Minc's agreement to employ Employee, during Employee's employment with Minc, and at any time after the termination of Employee's employment with Minc for any reason, Employee will not disseminate, publish, disclose, use for Employee's own benefit or the benefit of others, or divulge or convey to others, any Trade Secrets of Minc or that of third parties obtained by Employee following Minc's agreement to employ Employee and/or in the course of Employee's employment with Minc.

* * *

> Employee further agrees that at all times following Minc's agreement to employ Employee, during Employee's employment with Minc, and after the termination of Employee's employment with Minc for any reason, except on behalf of Minc, Employee will not disseminate, publish, disclose, use for Employee's own benefit or the benefit of others, or divulge or convey to others, any Confidential Information of Minc in any form, tangible or intangible.

---

[1] The following facts are taken as true from the first amended complaint.  (Doc. 36.)

[2] For ease and consistency, record citations are to the electronically stamped CM/ECF document and PageID# rather than any internal pagination.

<u>Non-Solicitation of Employees.</u>

Employee agrees that during Employee's employment with Minc and for a period of twelve (12) months after termination of Employee's employment with Minc for any reason, Employee will not recruit, hire or attempt to recruit or hire, directly or by assisting others, any other employee of Minc with whom Employee had material contact during Employee's employment with Minc.

(*Id.* at 487–89.)[3]  The Employment Agreement defines "Trade Secrets" as

information contained within Minc's internal intranet and/or database (including, but not limited to, training resources, presentations, contacts, web content removal companies, pricing information, business transactions), Minc's actual or potential vendor lists (including contact name, addresses, telephone numbers, and specific characteristics), pricing information (such as price lists, quotation guides, previous or outstanding quotations, or billing data.

(*Id.* at 488.)  The Employment Agreement defines "Confidential Information" as

proprietary business information that is treated as confidential or secret by Minc, but that may not constitute a Trade Secret. . . . Confidential Information does not include information that is generally available to the public other than as a result of a breach of a contractual or other duty of confidentiality.

(*Id.*)  Lastly, the Employment Agreement further required Stebbins to return "all Minc property"

upon his termination, which includes

vendor lists or names, addresses, telephone numbers and services, vendor background information, vendor pricing, quotation guides and billing information, client files, all drawings, plans, manuals, letters, notes, notebooks, reports, sketches, formulae, source codes, computer programs and similar items, memoranda, and all other materials and all copies thereof relating in any way to Minc's business and in any way obtained by Employee during the period of Employee's employment with Minc which are in Employee's possession, custody or control.

(*Id.*)

---

[3] These provisions are referenced herein as the "Confidentiality Provisions" and the "Non-Solicitation Provision."

In or around February or March 2022, Buckingham, Doolittle & Burroughs, LLC ("BDB") sought to establish an online reputational harm practice. (*Id.* at 490.) To do so, BDB began recruiting Stebbins. (*Id.*) Between March 9 and May 11, 2022, Stebbins and BDB held several meetings. (*Id.*) These meetings centered around BDB establishing a new practice that was a direct replica of Minc's model with Stebbins at the helm. (*Id.*) Prior to meeting, BDB and Stebbins executed a non-disclosure agreement. (*Id.*) During these meetings, BDB requested Stebbins provide Minc's internal financial and statistical reports. (*Id.*) In addition, Stebbins shared a strategic plan with BDB, including financial modeling, projected revenue, costs, and profitability. (*Id.*) All of the information Stebbins shared during these meetings was directly based on or copied from Minc's own proprietary and confidential business strategy documents. (*Id.*) In addition, BDB requested, and Stebbins shared, information relating to hours billed; revenue collected; financial data; realization rates; marketing, SEO, and sales conversion metrics; client names; and information on key vendors and relationships, among other statistical and confidential information. (*Id.* at 491.)

On May 12, 2022, BDB offered Stebbins a partner position in its newly established online reputational practice. (*Id.* at 492.) The next day, Stebbins accepted the offer. (*Id.*) On May 18, 2022, Stebbins informed Minc of his resignation. (*Id.*) Stebbins' last day at Minc was May 31, 2022. (*Id.*) After Stebbins accepted BDB's offer, but before Stebbins' last day at Minc, Stebbins allegedly engaged in a series of activities to misappropriate as much information as possible from Minc so that he could quickly start his new practice at BDB. (*Id.*)

On May 14, 2022, the day after Stebbins accepted BDB's offer but before he gave notice of his resignation to Minc, Stebbins began recruiting a Minc associate, Christina Williams ("Williams"). (*Id.*) Stebbins provided BDB with information relating to Williams' workload,

4

value, skills, quality of work, productivity, billable hours, revenue generated, and client origination.  (*Id.*)  Stebbins provided this information to BDB so that BDB could assess whether to hire Williams.  (*Id.* at 493.)  On June 24, 2022, BDB offered Williams an associate position, which she accepted.  (*Id.*)

At the same time Stebbins was recruiting Williams, Stebbins allegedly engaged in the "systematic and unauthorized transfer of confidential and proprietary Minc files and information."  (*Id.*)  For instance, Stebbins downloaded tens of thousands of Minc's confidential files to a thumb drive, which included client files, trade secrets, legal documents, and internal operational files.  (*Id.* at 493–94.)  Among the documents were client files for "200+ legal matters he worked on at Minc, including some he was not materially involved in at all."  (*Id.* at 494.)  Additionally, Stebbins allegedly downloaded and took hundreds of files relating to Minc's operational processes, including educational materials, marketing strategies, content creation operations, SEO techniques, presentations and training materials, videos, templates, sample legal documents, marketing content, operational templates and forms, and client intake materials.  (*Id.* at 494–95.)  Stebbins also allegedly downloaded and took files relating to Minc's operational tools, resources, and key industry contacts which Minc worked to create for over a decade.  (*Id.* at 495.)

On May 17, 2022, the day before Stebbins informed Minc of his resignation, Stebbins downloaded the entire PST file for his Minc email account.  (*Id.* at 496.)  Stebbins redownloaded the PST file on May 31, 2022.  This gave Stebbins access to every email he ever sent and all attachments or documents attached thereto during his tenure with Minc.  (*Id.*)  These files necessarily included a vast array of information and included Minc's long-term and short-term

strategies, financial performance, key performance indicators relating to Minc's staff, and other essential business functions.  (*Id.*)

Hours before his departure, Stebbins looked up online "how to backup outlook."  (*Id.* at 497.)  Subsequently, Stebbins backed up and synced his entire Minc computer files and folders to his personal OneDrive account.  (*Id.* at 496.)  Then, Stebbins looked up online "how to wipe a computer."  (*Id.* at 497.)  Stebbins then attempted to wipe his computer and returned his Minc laptop.  (*Id.*)

Minc also alleges that its investigation revealed Stebbins engaged in "warehousing" where Stebbins significantly increased his client load at Minc just before his departure by using his preferential access to client consultations.  (*Id.*)  This allowed Stebbins to increase his active files by almost three times his average and positioned Stebbins with a greater number of client files with which he could bring to BDB.  (*Id.* at 497–98.)

Finally, Minc alleges that after Stebbins' departure, it discovered Stebbins engaged in unauthorized work outside of Minc while he was employed there, including one instance where Stebbins engaged in the practice of law in Kentucky, a state in which Stebbins was not credentialed.  (*Id.* at 499–50.)

### B.      Procedural History

From the above facts, Minc brought a seven-count complaint against Stebbins and BDB, alleging:  misappropriation of trade secrets under the Defend Trade Secrets Act ("DTSA") (Count One); misappropriation of trade secrets under the Ohio Uniform Trade Secrets Act ("OUTSA") (Count Two); breach of contract (Count Three); tortious interference with contract and business relationship (Count Four); conversion (Count Five); unjust enrichment (Count Six); and breach of fiduciary duty (Count Seven).  (Doc. 36.)  Minc brings Counts One, Two, Four,

Five, and Six against Stebbins and BDB.  (*Id.*)  Minc brings Count Three and Seven against

Stebbins only.  (*Id.*)

In addition to seeking certification and a stay, defendants jointly submitted a partial

motion to dismiss.  (Doc. 44.)  Specifically, they seek dismissal of Counts Three through Six of

Plaintiff's first amended complaint for failure to state a claim.  (*Id.*)

## II.    Analysis

### A.    Certification of a Question of Law to the Ohio Supreme Court

Defendants request certification of a question of law to the Ohio Supreme Court and a

stay this litigation.  (Doc. 46.)  The request is rooted in Defendants' arguments relating to the

Non-Solicitation Provision in the Employment Agreement.  (*Id.* at 678.)  Defendants argue in

their motion to dismiss that the Non-Solicitation Provision is invalid as a matter of law because it

violates the Ohio Rules of Professional Conduct.  (*Id.* at 679.)  The Ohio Rules of Professional

Conduct provides, in pertinent part:

> A lawyer shall not participate in offering or making either of the following:
>
> (a) a partnership, shareholders, operating, employment, or other similar type of
> agreement that ***restricts the right of a lawyer to practice*** after termination of the
> relationship, except an agreement concerning benefits upon retirement;
>
> (b) an agreement in which a restriction on the lawyer's right to practice is part of
> the settlement of a claim or controversy.

Prof.Cond.R. 5.6 (emphasis added).  Defendants argue that the Non-Solicitation Provision

violates this rule because it is a restriction on the right of a lawyer to practice law after

termination of the relationship.  (Doc. 46 at 679.)  Accordingly, Defendants ask the following

question be certified:

> Whether a non-solicitation clause that seeks to restrict an attorney from soliciting
> other attorneys for employment, thereby limiting the movement of attorneys, is a

prohibited restriction on the right to practice law and violates Ohio Rule of Professional Conduct 5.6.

(*Id.* at 679.)

Under the Ohio Supreme Court Rules of Practice, the Ohio Supreme Court "may answer a question certified to it by a court of the United States." S.Ct.Pract.R. 9.01. The rule may be invoked if a "certifying court, in a proceeding before it, issues a certification order finding there is a question of Ohio law that may be determinative of the proceeding and for which there is no controlling precedent . . . ." S.Ct.Pract.R. 9.01(A). Thus, a court may certify a question if: (1) there is a question of Ohio law; (2) the question may be determinative of the proceeding; and (3) there is no controlling precedent. *Id.*; *see also Pro. Direct Ins. Co. v. Wiles, Boyle, Burkholder & Bringardner Co., LPA*, No. 06-cv-240, 2008 WL 3925634, at *1 (S.D. Ohio Aug. 25, 2008). Whether to certify a question of law is within the court's "sound discretion." *In re Amazon.com, Inc.*, 942 F.3d 297, 300 (6th Cir. 2019) (citing *Lehman Bros. v. Schein*, 416 U.S. 386, 391 (1974)). Certification is "most appropriate when the question is new and state law is unsettled." *Id.* (quoting *Transamerica Ins. Co. v. Duro Bag Mfg. Co.*, 50 F.3d 370, 372 (6th Cir. 1995)).

In making certification decisions, "the United States Supreme Court has recognized that certification of 'novel or unsettled questions of state law for authoritative answers by a State's highest court . . . may save time, energy, and resources and help build a cooperative judicial federalism.'" *Planned Parenthood of Cincinnati Region v. Strickland*, 531 F.3d 406, 410 (6th Cir. 2008) (quoting *Arizonans for Official English v. Arizona*, 520 U.S. 43, 77 (1997)). "That is not to say, however, that a federal court should certify any question that has not been specifically addressed by the Ohio Supreme Court." *Metz v. Unizan Bank*, 416 F.Supp.2d 568, 574 (N.D. Ohio 2006). Thus, certification "should not be invoked merely because it may be difficult for the court to ascertain what the local law provides." *Id.* (citing *Duryee v. United States Dep't of the*

8

*Treasury*, 6 F.Supp.2d 700, 704 (S.D. Ohio 1995)).  The Sixth Circuit has explained that "[w]e generally will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks.  When we see a reasonably clear and principled course, we will seek to follow it ourselves."  *In re Amazon.com*, 942 F.3d at 300 (quoting *Pennington v. State Farm Mut. Auto. Ins. Co.*, 553 F.3d 447, 450 (6th Cir. 2009)).  The court can do this through the *Erie*-guess doctrine: "When presented with an issue concerning the interpretation of a state law, a federal court's normal course is to 'make an *Erie* guess to determine how a state supreme court, if presented with the issue, would resolve it.'"  *In re Nat'l Prescription Opiate Litig.*, 82 F.4th 455, 461 (6th Cir. 2023) (quoting *Conlin v. Mortg. Elec. Registration Sys., Inc.*, 714 F.3d 355, 358–59 (6th Cir. 2013)).

That there is a question of Ohio law is not in dispute.  However, Minc opposes certification arguing that the proposed question is not determinative, that sufficient guidance on the issue exists, and that certification is premature.  (Doc. 48.)  Lastly, Minc argues a stay should not be imposed even if a question is certified.  (*Id.*)

Courts have used varying approaches to analyze whether a question of law is "determinative of the proceedings."  On the one hand, courts have found that "[a] question which may be determinative of a proceeding is one which would form the basis of the Court's disposition of one or more of a plaintiff's causes of action."  *Pro. Direct*, 2008 WL 3925634, at *2 (citing *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 744 (6th Cir. 1999)).  On the other hand, courts have rejected certification of a question where the question "affects a few claims" and "will not determine the whole proceeding against all Defendants."  *Brack v. Budish*, 539 F.Supp.3d 794, 801 (N.D. Ohio. 2021).

9

Here, Defendants argue that the non-solicitation question is determinative of the amended complaint.  (Doc. 46 at 682–83.)  Although Defendants do not specifically say so, the non-solicitation question only relates to Counts Three and Four.  (Doc. 46 at 682–83.)  Count Three alleges breach of contract and Count Four alleges tortious interference.  (Doc. 36 at 504.)  Count Three is based on two separate breaches of Stebbins' employment agreement: breach of the Confidentiality Provisions; and breach of the Non-Solicitation Provision.  (*Id.* at 504–05.)  Count Four is based on two separate theories of interference: Stebbins' and BDB's interference with Minc's vendors and employees; and BDB's interference with Stebbins' Employment Agreement. (*Id.* at 505–06.)  Minc argues that the non-solicitation question, while intertwined in parts of some of the claims, is not determinative of many counts in the complaint, most notably the trade secret claims.  (Doc. 48 at 745–46.)

The non-solicitation question would partially resolve Counts Three and Four.  No matter how the Ohio Supreme Court rules on the non-solicitation issue, Counts Three and Four would continue in some capacity (subject to other arguments made by Defendants in their motion to dismiss).  So, while the non-solicitation question would resolve certain subparts of claims, it would not fully resolve them, nor the remaining counts in the complaint.  In this way, the answer to the certified question would not be "determinative of the proceeding."  S.Ct.Pract.R. 9.01(A).

In other cases where courts have certified questions to the Ohio Supreme Court, the questions were dispositive of the entire case.  For instance, in *Am. Booksellers Found. For Free Expression v. Strickland*, the question at issue—standing—would undermine plaintiff's entire case if the Ohio Supreme Court held that plaintiff did not have standing to sue.  560 F.3d 443, 447 (6th Cir. 2009).  In *Planned Parenthood of Cincinnati*, the interpretation of a statute would either allow the entire case to proceed or render plaintiffs' claims moot.  531 F.3d at 411.  And in

10

*City of Maple Heights v. Netflix, Inc.*, the court certified a question where the interpretation of a statute determined if defendants were subject to laws underlying the entire case.  No. 20-cv-1872, 2021 WL 2784440, *1 (N.D. Ohio July 2, 2021).  Unlike these cases, the non-solicitation question at issue would resolve only parts of some claims.  Accordingly, the Court denies the request to certify a question of law to the Ohio Supreme Court.[4]  The motion to stay is denied as moot.

### B.    Motion to Dismiss

#### 1.    Legal Standard

When addressing a motion to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must construe the complaint in the light most favorable to the plaintiff and accept all well-pleaded material allegations in the complaint as true.  *Kensu v. Corizon, Inc.*, 5 F.4th 646, 649–50 (6th Cir. 2021) (setting forth the standard of review for a motion to dismiss); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The sufficiency of the complaint is tested against the notice pleading requirement that a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  Fed. R. Civ. P. 8(a)(2).  The purpose of this requirement is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."  *Kensu*, 5 F.4th at 650 (alteration in original) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

Under *Twombly* and *Iqbal*, a complaint survives a motion to dismiss for failure to state a claim only if the complaint alleges enough facts to make out a "plausible" legal claim.  *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  In this context, "plausibility" is a legal

---

[4] As explained below, there is "no controlling precedent" under Ohio law for the specific legal issue presented in this case.  While that element is satisfied for certification, the Court cannot certify the question because it is not determinative of the proceedings.

term of art.  A claim is plausible only if there are sufficient factual allegations to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* Plausibility does not require a plaintiff to show any particular probability of success, but it requires "more than a sheer possibility that a defendant has acted unlawfully."  *Id.*  That is, a plaintiff needs to plead facts that are more than "merely consistent with" legal liability—the allegations must support an affirmative inference of liability.  *Id.* (quoting *Twombly*, 550 U.S. at 557).

When courts evaluate whether a complaint makes out a plausible claim, they must accept all factual allegations as true.  *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 534 (6th Cir. 2017) (quoting *Bickerstaff v. Lucarelli*, 830 F.3d 388, 396 (6th Cir. 2016)).  Courts must also draw all reasonable inferences in favor of the plaintiff, and they must generally construe the complaint in the light most favorable to the plaintiff.  *Id.*  But courts do not accept legal conclusions or other conclusory allegations as true.  *D'Ambrosio v. Marino*, 747 F.3d 378, 383 (6th Cir. 2014) (quoting *Terry v. Tyson Farms, Inc.*, 604 F.3d 272, 275–76 (6th Cir. 2010)).  And courts are not required to make unwarranted factual inferences.  *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006).

## 2.       Breach of Contract (Count Three)

Count Three of the first amended complaint alleges breach of contract against Stebbins. (Doc. 36 at 504.)  The claim is premised on various alleged breaches of the Employment Agreement, including breaches relating to the Confidentiality Provisions and Non-Solicitation Provision.  (*Id.* at 504–05.)  Minc alleges that Stebbins breached these provisions when he, among other things, forwarded Minc's information to his personal email account, downloaded Minc files to external drives, failing to return information upon his termination, using and

disclosing information developed while he was employed at Minc, and soliciting employees and vendors with whom he worked while employed at Minc.  (*Id.* at 505.)

Stebbins argues that Count Three should be dismissed in its entirety solely because the Confidentiality Provisions and Non-Solicitation Provision violate the Ohio Rules of Professional Conduct.  (Doc. 44 at 666.)  Specifically, Stebbins argues that the Employment Agreement restricts his right to practice law and improperly restricts client choice in violation of Rule 5.6. (Doc. 44 at 666.)

The parties have not presented the Court with any controlling Ohio case law that would control the outcome of this case.  That is, no party has cited cases to this Court that discuss issues regarding employment agreements made between attorneys and their law firms with respect to the interpretation of any confidentiality or non-solicitation provisions in those agreements.  The Court has similarly found none.  However, at least one court in Ohio has interpreted Rule 5.6 in the context of an employment agreement.  *See Hackett v. Moore*, 939 N.E.2d 1321 (Ohio Ct. of C.P. 2010).  *Hackett* is instructive here and guides the Court's decision.

A "contract term [that] violates the Ohio Rules of Professional Conduct does not automatically make it unenforceable."  *Id.* at 1326.  Instead, "[t]he question is whether the rule embodies a public policy of the state so that enforcement of the employment contract would thwart that public policy."  *Id.*  In Ohio, "contract terms that violate public policy are unenforceable."  *Id.* (quoting *Sammarco v. Anthem Ins. Co.*, 723 N.E.2d 128, 132 (Ohio Ct. App. 1998)).  "The Ohio Supreme Court has recognized that there exists a strong public-policy interest in permitting a party's 'continued representation by counsel of his or her choice.'"  *Id.* (quoting *Kala v. Aluminum Smelting & Refining Co.*, 688 N.E.2d 258, 263 (Ohio 1998)).  There further exists a strong public policy against agreements that "limits the professional autonomy of the

13

lawyer." *Id.*; *see also* Prof.Cond.R. 5.6, cmmt. 1 ("An agreement restricting the right of lawyers to practice after leaving a firm not only limits their professional autonomy but also limits the freedom of clients to choose a lawyer.").  Rule 5.6 of the Ohio Rules of Professional Conduct guard these key public policy interests.  *Id.*; *see also Nixon Peabody LLP v. de Senilhes, Valsamdidis, Amsallem, Jonath, Flaicher Associes*, 20 Misc.3d 1145(A), 873 N.Y.S.2d 235 (N.Y. Sup. Ct. 2008) ("An important aspect of attorney autonomy is the promotion of attorney mobility which is the unstated—but real—purpose of the rule.") (quotation and citation omitted).  Thus, as the *Hackett* court held, if a contract violates Rule 5.6, the contract also violates public policy and cannot be enforced.

In *Hackett*, defendant Moore was an associate at plaintiff Hackett Law Offices.  939 N.E.2d at 1324.  Moore signed an employment agreement which required him to pay Hackett— upon his departure—95% of attorney fees for cases that Moore takes with him.  *Id.*  Essentially, if Moore left Hackett with clients, almost all of the attorney fees generated from those clients would have to be remitted to Hackett.  *Id.*  When Moore departed and failed to pay the fee, Hackett sued.  *Id.*  The trial court granted Moore's motion to dismiss, finding that the employment agreement was void because it violated Ohio Rule of Professional Conduct 5.6 and Ohio public policy.  *Id.* at 1325.  The court explained:

> While such a provision might not completely preclude a client from continuing legal representation with the departing attorney, the effect of the 95 percent fee-sharing requirement is to make it economically impractical for the lawyer to continue the representation.

*Id.*  Relying on Advisory Opinion 91-3, the court further explained that the provision's "practical effect is to interfere with a client's freedom of choice of counsel."  *Id.*  The advisory opinion explained:

> An employment agreement with a financial disincentive to serving clients improperly places a burden on the departing attorney and impairs clients' freedom to choose counsel.
>
> * * *
>
> Although such agreements may not facially appear to limit professional autonomy or a client's freedom to choose, the practical effect may limit both.

Bd. of Comm'ns on Grievances and Discipline, Advisory Op. 91-3 (Feb. 8, 1991).[5]  As it relates to Moore's agreement, the court found that "[t]here can be no real question that the agreement at issue limits the freedom of clients to choose a lawyer." *Hackett*, 939 N.E.2d at 1326.  As such, it violated the purpose of Rule 5.6 because it limited the "professional autonomy of the lawyer" and because it "limits the freedom of clients to choose a lawyer."[6] *Id.*

Under *Hackett*, the Court can discern the following proposition of law: a provision in an employment agreement made between a law firm and an attorney is invalid as against Ohio public policy if the provision, directly or indirectly, restricts the right of the attorney to practice law, the right of attorney autonomy, or the right of a client to choose the attorney of his or her choice.[7]  Utilizing this rule, the Court turns to the Non-Solicitation Provision and Confidentiality Provisions presented in this case.

---

[5] This advisory opinion was withdrawn by Advisory Op. 2021-7.  *See* Bd. of Comm'ns on Grievances and Discipline, Advisory Op. 2021-7 (Aug. 6, 2021).  However, the updated advisory opinion comes to the same conclusion as the one relied on by the *Hackett* court.

[6] The Ohio Supreme Court later found that Hackett violated the Ohio Rules of Professional Conduct in making the agreement.  *Cincinnati Bar Ass'n v. Hackett*, 950 N.E.2d 969, 971 (Ohio 2011) ("If enforced, this clearly excessive fee would create an economic deterrent for the departing attorney that would adversely affect the clients' right to retain an attorney of their own choosing.").

[7] The Court finds support for this rule in other places as well.  *See Dowd & Dowd, Ltd. v. Gleason*, 693 N.E.2d 358, 369 (Ill. 1998) (invalidating contract that "contradicts" the purposes of Rule 5.6 which "is designed both to afford clients greater freedom in choosing counsel and to protect lawyers from onerous conditions that would unduly limit their mobility"); Restatement

####    a.        Non-Solicitation Provision

The Non-Solicitation Provision restricts Stebbins from recruiting any Minc employee with whom Stebbins had material contact during the 12-month period following Stebbins' separation from Minc.  (Doc. 36 at 489.)  The Court holds that this type of provision violates Rule 5.6 of the Ohio Rules of Professional Conduct and Ohio public policy.  As such, the Non-Solicitation Provision is unenforceable as a matter of law.  While there is no clear Ohio law on this issue, as explained above, the *Hackett* court's ruling is instructive here:  the Non-Solicitation Provision violates Rule 5.6 and Ohio public policy if it directly or indirectly restricts the right of the attorney to practice law, the right of attorney autonomy, or the right of a client to choose the attorney of his or her choice.  The Court finds that the Non-Solicitation Provision directly and indirectly restricts the purposes of Rule 5.6.

In support of its argument that the Non-Solicitation Provision is enforceable here, Minc relies on an Ohio advisory opinion.  *See* Ohio Bd. of Professional Conduct Advisory Op. 2020-01, *Covenant Not to Compete Offered to In-House Counsel* (Feb. 7, 2020).  This opinion addressed whether an attorney working as in-house counsel can agree to a restrictive covenant that restricts the attorney's ability to compete with the company upon separation.  The Board found that "[t]he prohibition in Prof.Cond.R. 5.6(a) applies to restrictions on a lawyer's provision of future legal services, but not to job functions the lawyer may perform that do not constitute the practice of law."  *Id.*  Accordingly, "a lawyer may execute an employment contract for an inhouse position that is drafted in a manner to permissibly restrict only those future

---

(Third) of the Law Governing Lawyers § 13 ("a lawyer may not offer or enter into a restrictive covenant with the lawyer's law firm or other employer if the substantial effect of the covenant would be to restrict the right of the lawyer to practice law after termination of the lawyer's relationship with the law firm."); ABA Informal Opinion 1417 (June 27, 1978) (finding that both direct and indirect restrictions on the practice of law implicate Rule 5.6).

activities that do not constitute the practice of law." *Id.* From this, Minc argues that a non-solicitation clause is enforceable because hiring and recruitment efforts conducted by attorneys is not the practice of law. (Doc. 47 at 701.)

Minc also relies on other state's advisory opinions on this issue. (*Id.* at 706.) Rhode Island issued an ethics advisory opinion relating to non-solicitation provisions. *See* Advisory Panel Op. No. 2003-07, Request No. 862 (Nov. 18, 2003). That advisory opinion explained:

> A provision in a post-employment agreement in which a law firm agrees to pay severance compensation to a departing associate in exchange for the associate's promise not to solicit the firm's clients violates Rule 5.6 of the Rules of Professional Conduct. A provision which restricts the associate from soliciting the law firm's employees is beyond the scope of Rule 5.6 and is permissible.

Relating to the non-solicitation of clients, the advisory opinion found that the clause would create an indirect restriction on the practice of law. However, without explanation, the advisory opinion also found that the same non-solicitation provision relating to the former employer's employees was not violative of Rule 5.6.

Similarly, the North Carolina State Bar issued an advisory opinion finding that a non-solicitation provision was enforceable. *See* N.C. State Bar, Formal Ethics Opinion 5, *Agreement Not to Solicit or Hire Lawyers from Another Firm As Part of Merger Negotiations* (Oct. 27, 2017). But the circumstances leading to the non-solicitation agreement at issue centered on both law firms consenting for purposes of due diligence and merger negotiations. There, the non-solicitation provision restricted either firm's ability to solicit attorneys from the other firm should the merger fail. The opinion explained that the non-solicitation clause was enforceable "because it imposes a *de minimis* restriction on the mobility of the lawyers in the firms, does not impair client choice, and is reasonable under the circumstances." Under the facts of this case, the opinion found the restriction valid because "the restriction is for a relatively short, defined period

of time and only with regard to employment with one other law firm; the lawyers in the firms are free to seek employment with any other law firm" and "the provision does not prevent or inhibit a client from following a lawyer who departs one of the firms for employment with a firm not subject to the agreement."

In opposition, Stebbins relies on out-of-state cases and advisory opinions.  Stebbins primarily relies on *Jacob v. Norris, McLaughlin & Marcus*.  607 A.2d 142 (N.J. 1992).  In *Jacob*, plaintiff attorneys left Defendant Norris, McLaughlin & Marcus ("NMM").  *Id.* at 144.  NMM had a termination agreement that prohibited departing attorneys from collecting termination compensation if the departing attorney continued to represent firm clients or solicited firm attorneys or staff.  *Id.*  Plaintiffs left NMM and demanded their termination compensation, which NMM refused to pay because when plaintiffs left NMM, they took with them clients and other attorneys.  *Id.* at 145.  Plaintiffs sued, arguing that the termination agreement violated Rule 5.6. *Id.*  As it relates to the non-solicitation clause, the court held that "[t]he 'practice of law' consists not only of lawyers' interactions with their clients, but also includes their interactions with colleagues.  Agreements discouraging departing lawyers from contacting those lawyers with whom they would like to associate violate RPC 5.6."  *Id.* at 153.  The court explained:

> The provision unduly constricts the right to practice of those attorneys who would have liked to have accompanied a departing partner, but who were not informed of that partner's interest due to an agreement creating a disincentive against their being contacted. The effect is all the more objectionable when the ignored attorney is an associate who was not a party to the agreement establishing the restriction.
>
> * * *
>
> The practice of law also involves seeking the best services for one's clients.  In some cases, lawyers may believe that the interests of their clients will be hindered by agreements that prohibit the free flow of attorneys and paraprofessionals.  An associate familiar with the complex facts of a major case for a client who chooses to follow a departing partner may be an irreplaceable asset to that case.  If

18

> agreements discourage lawyers from soliciting such associates' continued assistance, attorneys may feel that their ability to represent their clients is being compromised.  The same may be true of paraprofessionals, although we recognize that a paraprofessional's work typically does not rise to the same level of importance.  Accordingly, we conclude that the unrestricted "practice of law" includes the right to solicit both attorneys and those members of the paraprofessional staff that attorneys believe are necessary to provide the best legal service for their clients.

*Id.*  Moreover, the ABA issued an informal opinion on this issue, finding that an agreement that prohibits a departing partner from hiring or associating with the former firm's associates violates DR 2-108(A) (the precursor to Rule 5.6).  *See* ABA Informal Opinion 1417 (June 27, 1978).  The ABA explained:  "Although the agreement in question does not restrict the right of the individual lawyer to practice law directly, by restricting the right of association between attorneys it restricts such right indirectly and so falls within the prohibition of DR 2-108(A)."  *Id.*; *see also Gibbs v. Breed, Abbott & Morgan*, 271 A.D.2d 180, 187 (N.Y. App. Div. 2000) ("partners may not be restrained from inviting qualified personnel to change firms with them.").

On balance, the advisory opinions relied on by Minc are not persuasive.  The Ohio Advisory Opinion does not apply to the facts of this case.  Instead, that opinion allows an inhouse attorney to execute an agreement with a restrictive covenant that applies only to the business activities the attorney worked on.  Moreover, recruiting attorneys cannot properly be seen as a mere business activity as Minc argues.  That argument ignores that a restriction on recruitment can have an indirect impact on the practice of law.  For instance, in *Hackett*, the court found the fee arrangement violative of Ohio public policy, but the restriction did not completely inhibit a departing attorney's ability to practice law.  While the attorney may have to pay 95% of any engagement with a solicited client, the attorney could be free to take on any client regardless.  But the *Hackett* court explained that this type of arrangement violated Ohio public policy because its practical effect—although not completely—inhibited lawyer autonomy

and client choice.  The same is true here.  While the Non-Solicitation Provision, by its terms, does not directly inhibit the practice of law, its practical effect will inhibit Stebbins' and Williams' professional autonomy and, in turn, client choice.  And, as the *Jacob* court explained, the practice of law is broader than just interactions with clients but includes "interactions with colleagues."  *Jacob*, 607 A.2d at 153.

The Rhode Island advisory opinion offered no explanation or analysis for its conclusion that a provision which restricts an associate from soliciting the law firm's employees is beyond Rule 5.6, and instead, focused on whether the client-solicitation provision violated ethical rules. And the North Carolina advisory opinion found the non-solicitation clause reasonable, but only in the context of two law firms seeking to merge and where the agreement was limited to those two firms, among other limitations.

While *Jacob* is an out-of-state case, the public policy reasons underlying its rationale align with Ohio law.  The Non-Solicitation Provision here potentially inhibits Stebbins' professional autonomy.  For instance, a lawyer in Stebbins' position may decide not to leave Minc because of the inability to recruit lawyers with whom he worked closely while at Minc. And Stebbins may not have left Minc because he might have felt that he could not represent clients as effectively without Williams' (or others) continued assistance.  The Non-Solicitation Provision also potentially inhibits Williams' professional autonomy.  This is particularly troublesome where Williams' professional autonomy could be hampered by an agreement she did not sign and may not have even known about.  At the same time, clients could be harmed because departing lawyers, who are unable to recruit valuable associates, may feel unable to represent clients who have worked with both the departing attorney and the recruited attorney.

In conclusion, the Non-Solicitation Provision improperly restricts the practice of law in violation of Rule 5.6.  Under *Hackett*, such violations implicate public policy concerns.  As such, the Non-Solicitation Provision is void as against public policy and cannot be enforced to the extent it restricts Stebbins' ability to recruit attorneys and staff from Minc after his termination.  Defendants motion to dismiss the breach of contract claim premised on the Non-Solicitation Provision is, therefore, granted.[8]

### b.    Confidentiality Provisions

Stebbins argues that the Confidentiality Provisions are overly broad and implicate the right of a client to choose him as an attorney and his right to practice law.  (Doc. 44 at 667.)  However, at the motion to dismiss stage, the Court cannot find that the Confidentiality Provisions implicate such rights as a matter of law.

Minc agrees that an attorneys' employment agreement cannot restrict the ability of the attorney to retain client files after departure if the clients want to continue to use the departing attorney's services.  (Doc. 47 at 699.)  Minc argues that it does not seek to prevent Stebbins from doing so here.  (*Id.*)  Indeed, Minc formally permitted 35 clients to transfer their files to BDB, all of whom wanted Stebbins to continue representing them.  (Doc. 36 at 494.)  Thus, the breach of contract claim is not premised on Stebbins retaining client files for those clients that wanted Stebbins to continue to represent them.  To the extent that it did, such a provision would likely be

---

[8] Section 7 of the Employment Agreement contains a severability clause.  (Doc. 36 at 515.)  That clause states that "the covenants and agreements contained in this Agreement are separate, severable, and divisible, and in the event any portion or portions of such paragraphs are declared invalid or unenforceable, the validity of the remaining paragraphs of this Agreement will not be affected."  (*Id.*)  While the Court invalidates the Non-Solicitation Provision, the remainder of the Employment Agreement, pursuant to Section 7, remains in full effect.  *See Toledo Police Patrolmen's Ass'n, Local 10, IPUA v. Toledo*, 641 N.E.2d 799, 804 (Ohio Ct. App. 1994) (discussing enforcement of severability provision).

unenforceable.  *See* ABA Formal Opinion 489 (Dec. 4, 2019) ("[l]aw firms cannot prohibit a departing lawyer from soliciting clients" and "departing attorneys are permitted to retain names and contact information for clients for whom the departing lawyer worked while at the firm").

Notable, though, is that the first amended complaint alleges that while Minc authorized the transfer of some client files to BDB for Stebbins' continued representation, Stebbins "downloaded and copied documents related to virtually every one of the approximate 200+ legal matters he worked on at Minc, including some he was not materially involved in at all." (Doc. 36 at 494.)  From this one could reasonably infer that Stebbins' removal of materials included client information and other confidential information without any authorization.

Minc also alleges that Stebbins took business strategy documents, financial data, and other operational data and used those documents in meetings with BDB.  (*Id.* at 490–91.)  In fact, Stebbins allegedly mass downloaded client files, legal documents, and internal operational files from Minc to a thumb drive.  (*Id.* at 493–94.)  And Stebbins copied consultation sales strategies and process data, including consult policies, intake processes and procedures, templates and forms relating to day-to-day functioning, and client service and engagement strategies, among other information.  (*Id.* at 495–96.)  Lastly, Stebbins downloaded the entire PST file for his Minc email and synced his Minc computer to his personal OneDrive account.  (*Id.* at 496.)  This effectively gave him access to everything he had ever done at Minc.  (*Id.*)  Stebbins does not explain how any of this information could properly be considered a hindrance to his ability to practice law, the right of his autonomy, or the right of a client to choose their counsel.  Stebbins could—unfettered by the Confidentiality Provisions—continue to practice law and choose without restriction to leave Minc.  And clients could choose to follow Stebbins without issue.

Unlike in *Hackett*, nothing in the Confidentiality Provisions here could be interpreted to dissuade Stebbins from leaving Minc. Instead, the Confidentiality Provisions require that confidential firm information stay with Minc. And unlike in *Hackett*, the Confidentiality Provisions do not implicate client choice because the provisions do not apply to client files, which Stebbins was properly allowed to transfer to BDB once client approval was obtained.

As further support, Ohio has sanctioned attorneys who have violated ethical rules by taking confidential firm documents in an attempt to gain employment elsewhere. *See Disciplinary Counsel v. Robinson*, 933 N.E.2d 1095 (Ohio 2010) (disciplining attorney who misappropriated documents from his former law firm, provided those documents to a competitor firm with whom he was seeking potential employment, and then attempted to destroy the documents). And the ABA's guidance on this issue explains that "a departing partner may be required to return or account for firm property, such as intellectual property, proprietary information, and hardware/phones/computers, and to allow firm data to be deleted from all devices retained by the departing attorney, unless the data is part of the client files transitioning with the departing lawyer." ABA Formal Op. 489 (Dec. 4, 2019).

Stebbins only offers generalizations that the Confidentiality Provisions are overly broad because the provisions go beyond protecting confidential information and instead inhibit Stebbins' ability to practice law. (Doc. 44 at 667.) These arguments are not persuasive. For instance, Stebbins argues that the Confidentiality Provisions would require him to "unlearn how to draft a motion or evaluate a prospective client's claim" (Doc. 44 at 667) and that Minc seeks to treat attorney training as confidential business information (Doc. 50 at 764). This is not what Minc seeks to do. Instead, Minc alleges that Stebbins "downloaded and took hundreds of files" relating to "educational materials and supplementary assets related to Minc's innovative legal

methods, marketing strategies, content creation operations, and SEO techniques, internally

created PowerPoint presentations and training materials." (Doc. 36 at 494.)  While Stebbins is

free to use the training he received at Minc in his future legal career, he is not free to download,

*en masse*, the underlying material to take with him to a competitor to the extent that information

is protected by the Employment Agreement and does not affect Stebbins' right to practice law

under Rule 5.6.  That is what Minc seeks to prevent in this lawsuit, not prevent Stebbins from

using the skills he developed while at Minc at his new firm.

The case law cited by Stebbins does not support his conclusion that the Confidentiality

Provisions are overly broad.  For instance, Stebbins relies on *Early, Ludwick & Sweeney, LLC v.

Steele*.  No. CV-980409063S, 1998 WL 516156 (Conn. Super. Ct. Aug. 7, 1998).  But that case

involved only client information for matters on which the attorney specifically worked.  *Id.* at *3

("Defendant Steele acquired the client list by proper means, in the course of his work for

plaintiff.").  As described above, Stebbins allegedly stole thousands of documents relating to

clients for which he never had contact with and thousands of documents relating to the

operations of Minc generally.  Under similar facts, the Ohio Supreme Court found that an

attorney may be liable for misappropriation of trade secrets where the attorney misappropriated a

confidential client list.  *See Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853, 862

(Ohio 1999) (reversing trial court's grant of summary judgment on misappropriation claim

premised on former attorney stealing client list because fact question existed whether the list

qualified as a trade secret).

Discovery may reveal a different set of facts from those alleged.  If, through discovery,

Stebbins can show he took only documents and information that he could properly take,

dismissal at summary judgment may be proper.[9]  Moreover, Stebbins may show that the

Confidentiality Provisions, as applied and in effect, are overly broad.  But on a motion to

dismiss, where the facts alleged are that Stebbins plundered practically all of Minc's confidential

information, the Court cannot find that the provision is invalid as a matter of law.

### 3. Tortious Interference (Count Four)

Minc asserts a claim for tortious interference with contract and tortious interference with

business relationships.  (Doc. 36 at 505.)  Although not completely clear, the tortious interference

claims appear to be based on two theories:  Stebbins' and BDB's interference with the

contractual and business relationships between Minc and its vendors and employees; and BDB's

interference with the contractual relationship between Stebbins and Minc relating to breaches of

the Confidentiality Provisions and the Non-Solicitation Provision.  (*Id.*)  Defendants argue that

Minc's tortious interference claims fails as a matter of law because Minc did not allege that

Defendants induced a third-party to stop its relationship with Minc except for Williams.  (Doc.

44 at 670.)  Further, Defendants argue that to the extent the claims involve the solicitation of

Williams, the claims fail for the same reasons as above, namely, the provision is not enforceable.

(*Id.*)  In its opposition, Minc does not provide any argument relating to Defendants inducing a

third-party to stop its relationship with Minc.  (Doc. 47 at 706–07.)  Instead, Minc solely focuses

---

[9] In a formal opinion, the ABA explained that "the departing lawyer may avoid charges of
engaging in unfair competition and appropriation of trade secrets if she does not use any client
lists or other proprietary information to assist her in advising clients of her new association, but
uses instead only publicly available information and what she personally knows about the clients'
matters."  ABA Formal Op. 99-414, *Ethical Obligations When a Lawyer Changes Firms* (Sept. 8,
1999).  Moreover, the ABA explained that "[t]o the extent that these documents were prepared by
the lawyer and are considered the lawyer's property or are in the public domain, she may take
copies with her.  Otherwise, the lawyer may have to obtain the firm's consent to do so."  *Id.*

on whether it has alleged a proper claim as it relates to BDB's and Stebbins' solicitation of Minc employees. (*Id.*)

Under Ohio law, the elements of tortious interference with contract are: "(1) the existence of a contract, (2) the defendant's knowledge of a contract, (3) the defendant's intentional procurement of the contract's breach, (4) the lack of justification, and (5) the resulting damages from that breach." *Gentile v. Turkoly*, 86 N.E.3d 991, 997 (Ohio Ct. App. 2017) (citing *Fred Siegel Co., L.P.A. v. Arter & Hadden*, 707 N.E.2d 853 (Ohio 1999)). Further, "to state a claim for tortious interference with business relationships, a plaintiff must show (1) the existence of a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Kuvedina, LLC v. Cognizant Tech. Sol.*, 946 F.Supp.2d 749, 756 (S.D. Ohio 2013) (citing *Wagner v. Circle W. Mastiffs*, 732 F.Supp.2d 792, 807 (S.D. Ohio 2010)). The "torts of interference with business relationships and contract rights generally occur when a person, without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 651 N.E.2d 1283, 1294 (Ohio 1995).

With respect to Stebbins' and BDB's alleged interference with contractual and business relationships between Minc and its vendors and employees, the claim must be dismissed. Minc does not allege any interference induced a third-party to not enter into a contract with Minc or breach an existing contract. Instead, the claim is premised merely on allegations regarding communications with vendors and employees. That is not sufficient. Minc must further allege that those communications resulted in vendors deciding not to do business with Minc or breach

an existing contract with Minc.  *BCG Masonic Cleveland, LLC v. Live Nation Ent., Inc.*, 570 F.Supp.3d 552, 558 (N.D. Ohio 2021) (dismissing tortious interference with contract claim because "[Plaintiff's] failure to allege that [Defendant] procured an actual breach of any contract is fatal to its claim" and dismissing tortious interference with business relationship claim where plaintiff made "only vague and conclusory allegations of interference with its business relationships," did not identify any specific entity that was interfered with, and did not allege any entity was influenced not to enter an agreement).  Minc has not alleged any vendor or employee breached their contracts with Minc or did not do business with Minc because of Stebbins' or BDB's communications.  Because Minc has failed to allege that, the claim must be dismissed.

The second theory of Minc's tortious interference claim is that BDB interfered with Stebbins' Employment Agreement by allowing him to use Minc's confidential information (in violation of the Confidentiality Provisions) and allowing him to solicit Minc's employees (in violation of the Non-Solicitation Provision).  As it relates to the Confidentiality Provisions, Minc sufficiently pleads a claim of tortious interference.  Minc alleges that it had a contract with Stebbins, BDB knew about that contract, and BDB procured the breach of the Confidentiality Provisions by asking for and allowing Stebbins to use Minc's confidential and trade secret information.  That is sufficient to state a claim.  However, Minc's claim fails as it relates to the Non-Solicitation Provision because, as explained above, that provision is not enforceable.

In summary, the tortious interference claim can proceed with respect to BDB's alleged interference with Stebbins' employment agreement which contains confidentiality provisions preventing the use of Minc's confidential information and protected trade secrets.

### 4.      Preemption by OUTSA (Counts Four through Six)

Defendants argue that Counts Four through Six—all Ohio common law claims—are

preempted by OUTSA.  (Doc. 44 at 671.)  OUTSA expressly "diplace[s] conflicting tort,

restitutionary, and other laws . . . providing civil remedies for misappropriation of a trade secret."

R.C. § 1333.67(A).  "The test to determine whether a state law claim is displaced by OUTSA is

to determine whether the claims are no more than a restatement of the same operative facts that

formed the basis of the plaintiff's statutory claim for trade secret misappropriation."  *Stolle*

*Mach. Co. LLC v. RAM Precision Indus.*, 605 F. App'x 473, 484 (6th Cir. 2015) (quoting

*Thermodyn Corp. v. 3M Co.*, 593 F.Supp.2d 972, 989 (N.D. Ohio 2008)); *see also Jannx Med.*

*Sys., Inc. v. Agiliti, Inc.*, No. 20-cv-687, 2020 WL 7398795, *3 (N.D. Ohio Dec. 17, 2020) ("the

Act preempts other state law claims 'only to the extent that they are based on misappropriation-

of-trade-secrets facts.'") (quoting *Office Depot, Inc. v. Impact Office Prod., LLC*, 821 F.Supp.2d

912, 919 (N.D. Ohio 2011)).  Unless there is an "independent factual basis," the common law

claims are preempted.  *Office Depot*, 821 F.Supp.2d at 921.  The "key inquiry is whether the

same factual allegations of misappropriation are being used to obtain relief outside the Uniform

Trade Secrets Act."  *Hanneman Fam. Funeral Home and Crematorium v. Orians*, 235 N.E.3d

361, 367 (Ohio 2023).  In general, "granting a motion to dismiss on the ground that a claim is

preempted by OUTSA is inappropriate where it is 'unclear whether discovery would enable

plaintiff to base its additional state law claims on facts different from those alleged in its trade

secret claim.'"  *ADSC Holdings, Inc. v. Damman*, No. 20-cv-2554, 2021 WL 4189724, *1 (N.D.

Ohio Feb. 10, 2021) (quoting *Thermodyn*, 593 F.Supp.2d at 990).

As an initial matter, Minc argues that OUTSA preemption arguments made at the motion

to dismiss stage are premature.  (Doc. 47 at 708.)  Courts have sometimes found that dismissal

on preemption grounds can be inappropriate at the motion to dismiss stage. *See Noco Co. v. CTEK, Inc.*, No. 19-cv-853, 2020 U.S. Dist. LEXIS 27237, at \*23 (N.D. Ohio Feb. 2020) ("preemption is not ripe for review at the motion to dismiss stage."); *Source Assocs. v. Mitsui Chems. Am., Inc.*, No. 15-cv-215, 2016 U.S. Dist. LEXIS 27123, at \*21 (N.D. Ohio Mar. 3, 2016) (denying preemption arguments as premature at the motion to dismiss stage and deferring them to the summary judgment stage). But courts have routinely dismissed common law claims where the "cause of action is 'drawn entirely' from trade secret allegations, with no additional facts to support the claim." *Cincom Sys. v. Labware, Inc.*, No. 20-cv-83, 2021 WL 675437, at \* (S.D. Ohio Feb. 22, 2021) (quoting *Exal Corp. v. Roeslein & Assocs., Inc.*, No. 12-cv-1830, 2012 WL 4754748, at \*2 (N.D. Ohio Oct. 2, 2012)). Here, because the claims are "drawn entirely" from the trade secret allegations, the Court does not defer a ruling until summary judgment and instead, dismisses the claims now.

*Tortious Interference.* The remaining tortious interference theory relies on BDB's alleged interference with the Confidentiality Provisions in the Employment Agreement made between Minc and Stebbins. Under that theory, Minc alleges that BDB procured the breach of the Employment Agreement by asking for Minc's confidential information and allowing Stebbins to use such information while at BDB. The core of Minc's claim is that BDB procured and allowed Stebbins to take and use Minc's confidential and trade secret information. The claim is therefore "drawn entirely" from the trade secret claim. *See Stolle Mach.*, 605 F. App'x at 485 (affirming dismissal of tortious interference claim as preempted by OUTSA where claim depended on whether misappropriated customer lists and other technical information were actually trade secrets); *Allied Erecting and Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.*, 649 F.Supp.2d

29

702, 722–23 (N.D. Ohio 2009) (dismissing as preempted by OUTSA tortious interference claim premised on the breach of confidentiality provisions in employment agreement).

*Conversion*. This claim asserts that "Stebbins accessed Minc's proprietary systems and database and took Minc's files including those which contain Minc's confidential, proprietary, and trade secret information." (Doc. 36 at 506.) Minc identifies the following facts as distinct from the trade secret claim: "BDB has converted Minc's property because it continues to remain in BDB's systems and all sources have not been identified, searched or preserved." (Doc. 47 at 710.) However, these facts are the exact same facts as those underlying the OUTSA claim. For instance, the OUTSA claim alleges that Stebbins and BDB "have willfully and maliciously taken, retained, used, disclosed, and misappropriated Minc's confidential, proprietary, and trade secret information." (Doc. 36 at 503.) Minc then lists property that it claims were misappropriated. (*Id.*) That is the exact "property" that is the subject of the conversion claim. No discovery would enable Minc to base its conversion claim on any further non-trade secret related conduct. Because there is no independent basis for this claim other than Stebbins' alleged theft of trade secret information, this claim should be dismissed.

*Unjust Enrichment*. This claim asserts that "[b]y BDB employing Stebbins and allowing him to solicit employees and vendors with whom he worked while employed by Minc, and by Stebbins using Minc's confidential, proprietary, and trade secret information to compete with Minc . . . Defendants have been unjustly enriched." (Doc. 36 at 507.) Minc identifies the following facts as distinct from the trade secret claim: "BDB became unjustly enriched by employing Stebbins and allowed him to solicit employees and vendors." (Doc. 47 at 710.) The unjust enrichment claim as it relates to solicitation of employees fails for the same reasons as above. What is left is the unjust enrichment claim as it relates to vendors, but that too relies on

30

the trade secret allegations.  Minc alleges that Stebbins and BDB used Minc's trade secrets to communicate with those vendors.  Thus, this claim should be dismissed.

III.    **<u>Conclusion</u>**

For the reasons stated above, the Court DENIES the motion to stay and to certify a question of law to the Ohio Supreme Court, and GRANTS in part and DENIES in part the motion to dismiss.

**IT IS SO ORDERED.**

**Date**:    September 4, 2024

_____
BRIDGET MEEHAN BRENNAN
UNITED STATES DISTRICT JUDGE

31